**COPY**

FILED

2011 JAN 28 PM 3: 21

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

BY

Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
333 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Lead Plaintiffs and the Class

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------------X

MARK HENNING, ROMAN ZARETSKI,
AND CHRISTIAN STILLMARK,
INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED,

        Plaintiffs,

        vs.

ORIENT PAPER, INC.; ZHENYONG LIU;
WINSTON C. YEN; DAHONG ZHOU;
JING HAO; DREW BERNSTEIN; DAVIS
ACCOUNTING GROUP, P.C., and EDWIN
REECE DAVIS

        Defendants.

-------------------------------------------------X

CASE No.: 2:10-cv-05887-
VBF -AJW

**AMENDED COMPLAINT**

**CLASS ACTION**

**JURY TRIAL
DEMANDED**

1.    Court appointed Lead Plaintiffs Mark Henning, Roman Zaretski, and
Christian Stillmark (the "Plaintiffs") individually and on behalf of all other persons
similarly situated, by their undersigned attorneys, allege in this Consolidated
Amended Complaint (the "Complaint") the following upon knowledge with respect
to their own acts, and upon facts obtained through an investigation conducted by
their counsel, which included, *inter alia*: (a) review and analysis of relevant filings
made by Orient Paper, Inc. ("Orient Paper" or "the Company") with the United

1

States Securities and Exchange Commission (the "SEC"); (b) review and analysis of defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the Internet;   (e) interviews of several witnesses with personal knowledge of the relevant facts; (f) investigation of Chinese State Administration of Industry and Commerce ("SAIC") filings; (g) investigation and analysis of companies alleged to be purchasers of the Company's goods; (h) investigation and analysis of companies alleged to be suppliers of the Company.

2.     Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their control.

I.     **NATURE OF THE ACTION**

3.     This is a federal securities class action on behalf of all persons, other than defendants and their affiliates, who purchased the publicly traded common stock of ONP between March 27, 2009 through August 13, 2010 (the "Class Period"), seeking to recover damages caused by defendants' violations of federal securities laws (the "Class").

4.     During the Class Period, Defendants knowingly did not disclose that its CEO had a 70% equity interest[1] in Orient Paper's largest raw materials supplier –Xushui County Dongfang Trading Corp. ("Dongfang Trading").

5.     Although Orient Paper included a section in its SEC filings for "Related Party Transactions", it concealed that it was paying tens of millions of

---

[1] The Company, however, claims that Defendant Liu owned a 96% interest in the supplier.

Amended Class Action Complaint for Violation of the Federal Securities Laws

dollars each year to an entity owned and controlled by its Chairman and CEO, defendant Zhenyong Liu.

6.      In fact, Orient Paper affirmatively claimed in its publicly filed Code of Ethics that it avoided conflicts of interest with suppliers.  Dongfang Trading is a shell company with no assets or revenues.  Orient Paper made undisclosed related party transfers of $31 million in 2009, $28 million in 2008, $15.9 million in 2007 and $14.6 million in 2006 to Defendant Liu via Dongfang Trading in the guise of purchasing raw materials.

7.      Generally Accepted Accounting Principles ("GAAP") mandate that ALL material financial transactions between an issuer and its officers and directors be prominently disclosed in the financial statements.  Defendants knowingly failed to disclose the related party payments. As a result, Orient Paper's financial statements did not comply with GAAP and were materially misleading.

8.      The fraud at Orient Paper runs far deeper than the undisclosed related party transactions.   There is substantial evidence that the Company materially overstated its revenue in 2008 and 2009.   By some measures revenue was overstated between 25% and 50%.

9.      Analyses of Orient Paper's top ten customers show that many of these customers could not possibly have purchased the amounts Orient Paper claims they did because the customers' annual sales figures are significantly less than the amounts of their supposed purchases from Orient Paper.  Certain of Orient Paper's top 10 customers do not even exist and are pure fabrications.

10.     The nail in Orient Paper's coffin is that it hired for its legally mandated public audit a tiny firm run out of Cedar Rapids, Utah, Davis Accounting Group, P.C., *that had been disbarred* at the time it issued its certified financial statements for fiscal 2008 and filed them with the SEC in March 2008, and 2009.  Orient Paper's accounting firm had been disbarred for (among other things) not being

independent of the companies it audits.  The Company continued to insist that its audit was trustworthy and reliable for the entire class period.

11.     This is a case about a Company that falsified revenues, invented customers and inflated sales figures to these customers, manipulated its books, and hid $90 million in related party transactions with its CEO and largest shareholder.

12.     When the market learned of the fraud through a series of piece-meal disclosures, the price of Orient Paper stock dropped substantially, damaging investors.

## II.     JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

15.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

16.     In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.     PARTIES

17.     Court appointed lead plaintiffs Mark Henning, Roman Zaretski, and Christian Stillmark purchased Orient Paper common stock during the Class Period and have suffered damages as a result.  Lead Plaintiffs' Certifications have previously been filed with the Court and are incorporated herein by reference.

18.     Defendant Orient Paper purports to engage in the production and distribution of paper products such as corrugated paper, offset printing paper, and writing paper. All of Orient Paper's operations are conducted through Hebei Baoding Orient Paper Milling Company Limited ("HBOP").

19.     ONP is a holding company that operates through Dongfang Zhiye Holding Limited ("Dongfang Holding"), its wholly-owned subsidiary. Dongfang Holding was formed on November 13, 2006, under the laws of the British Virgin Islands, and is an investment holding company. Dongfang Holding, in turn, has contractual rights over HBOP, a company owned by Orient Paper's directors. HBOP is Orient Paper's only productive asset. Thus Orient Paper "controls" HBOP, and conducts substantially all of its business operations through HBOP.

20.     During the Class period, the Company's common stock was actively traded on the NYSE AMEX under the ticker "ONP."

21.     Defendant Zhenyong Liu ("Liu") was the Company's CEO and Chairman of the Board of Directors at all relevant times.  In addition, Defendant Liu was a substantial shareholder of the Company throughout the Class Period. When the Company filed its 2008 10-K, Defendant Liu held 34.69% of the Company's stock.  When the Company filed its 2009 10-K, Defendant Liu held 34.37% of the Company's stock.

22.     Defendant Jing Hao ("Hao") was the Company's CFO from November 16, 2007 until her resignation on May 1, 2009.

23.     Defendant Winston Yen ("Yen") was the Company's CFO from May 1, 2009 through the present.  Mr. Yen is a certified public accountant and a partner at ACCellence, LLP, a Los Angeles, California public accounting firm that he founded in December 2005.  Upon information and belief, Mr. Yen resides and works in Los Angeles County.

24.     Defendant Drew Bernstein ("Bernstein") was a director of the Company at the time of the filing of the Company's 10-K for fiscal year 2009. At

all times during the Class Period, Bernstein was Chairman or a member of Orient Paper's audit committee.  Mr. Bernstein is a certified public accountant and is co-founder and managing partner of Bernstein & Pinchuk LLP, an accounting firm headquartered in New York, a position he has held since 1983. Upon information and belief, Mr. Bernstein resides and works in New York City.

25.     Defendant Dahong Zhou ("Zhou") was the Company's Secretary and the Executive Manager of HBOP at all relevant times herein. As Executive Manager, Zhou had day-to-day control and responsibility for HBOP and its operations.

26.     Defendant Davis Accounting Group, P.C., is a now-defunct public accounting firm that operated in Cedar City, Utah.  Although not authorized by law to perform audits of public companies, the Davis Accounting Group audited the Company's books in 2008 and fraudulently certified the Company's fiscal 2007 and 2008 financial statements contained in its fiscal 2008 and 2009 annual reports on Form 10-K filed with the SEC.

27.     Defendant Edwin Reece Davis ("Davis") was the principal of the Davis Accounting Group and controlled Davis Accounting Group at all relevant times.

28.     Liu, Hao, Yen, Zhou, Bernstein, and Davis are collectively referred to hereinafter as the "Individual Defendants."

**A.      The Audit Committee**

29.     According to the Company's 2009 10-K, the audit committee "is involved in discussions with our independent auditor with respect to the scope and results of our year-end audit, our quarterly results of operations, our internal accounting controls and the professional services furnished by the independent auditor." According to Orient Paper's 2009 10-K, the audit committee is and was comprised of Drew Bernstein, Wenbing Christopher Wang and Zhaofang Wang,

with Mr. Bernstein serving as chairman. Prior to Mr. Bernstein's appointment as director, the audit committee consisted of all members of the board of directors.

**B.**   **The Individual Defendants**

30.   Each of the Individual Defendants:

a.   directly participated in the management of the Company;

b.   was directly involved in the day-to-day operations of the Company at the highest levels;

c.   was privy to confidential proprietary information concerning the Company and its business and operations;

d.   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.   approved or ratified these statements in violation of the federal securities laws.

31.   Orient Paper is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

32.   The *scienter* of the Individual Defendants and other employees and agents of the Company is similarly imputed to Orient Paper under *respondeat superior* and agency principles.

**IV.   BACKGROUND**

Amended Class Action Complaint for Violation of the Federal Securities Laws

33.    HBOP has been doing business in the Hebei province of China since 1996.  HBOP's main lines of business are, in order of importance for revenues: corrugated paper; medium and high grade offset paper; and writing paper.

34.    At all times relevant herein, Orient Paper's sole control over HBOP was through contractual arrangements.  Orient Paper does not own HBOP.  It is merely entitled to 80% of HBOP's revenue.

35.    In 2007, to access United States capital markets, the company became a publicly listed United State corporation registered in the State of Nevada.

36.    The Company employed a device called a "reverse merger".  In a reverse merger, a publicly traded shell company acquires the private company seeking to go public.  In exchange, the shareholders of the former private company receive a controlling share of the public company.

37.    On December 21, 2007, in connection with the reverse merger, the Company changed its name to Orient Paper.

38.    On November 18, 2007, Zhenyong Liu, Xiaodong Liu, Fuzeng Liu, and Chen Li were installed as new directors of the Company, and Dahong Zhou became Secretary.  In addition, on November 16, 2007, Zhenyong Liu became Chairman and CEO, and Jing Hao became Chief Financial Officer.

39.    In December 2007, the Company selected as its auditor the Davis Accounting Group for its fiscal 2007 audit.  The Davis Accounting Group had been investigated by the Public Company Accounting Oversight Board ("PCAOB") in June 2007.  The PCAOB is the nonprofit corporation, created by Sarbannes-Oxley, charged with regulating the public auditing profession.

40.    The PCAOB determined that the Davis Accounting Group's audits had deficiencies of such extent that the Davis Accounting Group "did not obtain sufficient competent evidential matter to support its opinion on the issuers' financial statements."  Further, the PCAOB determined that the Davis Accounting Group "inappropriately t[ook] responsibility for the work of another auditor when

the other auditor performed substantially all of the audit procedures that served as the basis for the Firm's opinion." More bluntly, the Davis Accounting Group signed off on accounting statements prepared by non-independent accountants.

41.     In addition, the PCAOB determined that the Davis Accounting Group did not provide sufficient safeguards for the independence of its audits, and that it had been unduly influenced by some of its clients.  The PCAOB also expressed concerns about a small regional accounting firm's ability to independently audit financial statements of foreign clients.  <u>The PCAOB publicized all these negative findings concerning Davis Accounting Group on April 24, 2008.</u>  PCAOB Release No. 104-2008-050A.

42.     The PCAOB also revoked both the Davis Accounting Group and Defendant Davis's license to serve as independent auditors to public companies on September 30, 2008.  In December 2010, Defendant Davis was even arrested on criminal charges for issuing bad checks.

43.     It was against this backdrop that the Company made the false and misleading statements during the class period.

## V. DEFENDANTS' MATERIAL MISREPRESENTATIONS

44.     The Class period begins on March 27, 2009, when the Company issued its fiscal 2008 annual report on form 10-K containing false and misleading financial statements and a fraudulent audit certification for fiscal years 2007 and 2008.

45.     Sarbanes-Oxley requires that audits be performed by auditors licensed by the PCAOB.  The certification of Orient Paper's fiscal 2007 and fiscal 2008 financial statements was materially false and misleading, because the audit of Orient Paper's financial statements and accompanying audit opinion was performed by an accounting firm that was disbarred at the time it signed the audit certification.

The 10-K did not disclose this fact. Instead, it included this audit opinion letter as a certification to shareholders:

### REPORT OF REGISTERED INDEPENDENT AUDITORS

To the Board of Directors and Stockholders of
    Orient Paper, Inc.:

We have audited the accompanying balance sheets of Orient Paper, Inc. (a Nevada corporation) as of December 31, 2008, and 2007, and the related statements of operations and comprehensive income, stockholders' equity, and cash flows for each of the two years in the period ended December 31, 2008. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States of America). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Orient Paper, Inc. as of December 31, 2008, and 2007, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2008, in conformity with accounting principles generally accepted in the United States of America.

Respectfully submitted,

/s/ Davis Accounting Group P.C.

Amended Class Action Complaint for Violation of the Federal Securities Laws

Cedar City, Utah,
March 19, 2009.

46.     According to the Company's 2007 10-K, each of the Individual Defendants as directors and members of the Audit Committee voted annually in November of each year to select and retain an independent auditor.     When defendants selected and retained Davis Accounting Group as Orient Paper's auditor in November 2008, defendants hired a disbarred accountant either knowingly or recklessly as the PCAOB had already published the report that led to the Davis Accounting Group being disbarred.

47.     The 2008 10-K was also false and misleading because it did not disclose material related party transactions between Orient Paper and its main supplier Dongfang Trading, which was owned and controlled by defendant CEO Zhenyong Liu.

48.     The 2008 10-K, which included financial statements for fiscal 2007 and 2008, concealed $28.5 million in related party payments from Orient Paper to Dongfang Trading in fiscal 2008, $15.9 million in fiscal 2007, and $14.6 million in 2006.

49.     Generally Accepted Accounting Principles ("GAAP") and SEC regulations required the Company to disclose all material related party transactions.

50.     Statement of Financial Accounting Standards ("SFAS") No. 57 and No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; 850-10-50-1[2]. "Related party transactions" include those between "an enterprise and its principal

---

[2] With the issuance of FASB Statement No. 168, *The FASB Accounting Standards Codification*[TM] *and the Hierarchy of Generally Accepted Accounting Principles*, the FASB approved the Codification as the source of authoritative US GAAP for non-governmental entities for interim and annual periods ending after September 15, 2009. Because the Class Period starts prior to the effective date of the Codification citations to the previous GAAP standards are also included.

Amended Class Action Complaint for Violation of the Federal Securities Laws

owners, management, or members of their immediate families" and those between a company and its "affiliates."  SFAS No. 57 ¶ 1; 850-10-05-3.  "Affiliate" includes any company that is under common control or management with the public company.  SFAS No. 57 ¶ 24(a, b); 850-10-20.

51.   HBOP, like all Chinese companies, is required to file annual comprehensive accounting reports with the provincial authorities, the China State Administration of Industry and Commerce ("SAIC") annually.  These SAIC filings include (amongst others) entries for revenues, profits, assets, and Cost of Goods Sold ("COGS").

52.   Disclosures of related party transactions shall include (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS No. 57 ¶ 2; 850-10-50-1.

53.   In addition, Orient Paper was required to but did not disclose:

a. That the Company's Chairman and CEO owned a 70% stake in its main raw materials supplier, as shown by Chinese SAIC filings;

b. That Dongfang Trading was a shell company, with revenues of just a few hundred thousand dollars;

C. That Orient Paper had made related party payments of $90.0 million to Dongfang Trading in the last three fiscal years.

54.   The related party nature of the transactions between Orient Paper and Dongfang Trading are evidenced by the SAIC filings for Dongfang Trading which state: (i) Dongfang Trading was created on August 2, 2001 with defendant Zhenyong Liu, and Chen Li (an Orient Paper director) as the sole shareholders.

Chen Li was also the legal representative of Dongfang Trading; (ii) On August 21, 2001, Chen Li transferred his Dongfang Trading shares to Jianjun Li, who assumed Chen Li's position as legal representative; (iii) Zhenyong Liu continued to own and control at least 70% of Dongfang Trading; (iv) On June 12, 2006, Zhenyong Liu increased his capital contribution as a shareholder of Dongfang Trading from RMB 0.35 million[3] to RMB 3.5 million and Jianjun Li increased his capital contribution from RMB 0.15 million to RMB 1.5 million.[4]

55.    A credit report dated June 30, 2010 from Qingdao Inter-Credit Services Pte Co., Ltd., a reputable independent China-based credit reporting agency corroborated all of the information in the preceding paragraph concerning Zhenyong Liu's share ownership and control of Dongfang Trading and that according to SAIC filings its annual revenue was only about $200,000. In addition, the individual preparing the credit report stated that Dongfang Trading had no known phone number, no website, no determinable operations, and "little business", if any.

56.    The credit agency contacted Orient Paper to obtain contact information for Dongfang Trading, but the employee at Orient Paper refused to provide any contact or other information about Dongfang Trading.

57.    The 2008 10-K affirmatively and materially misstated expenditures and revenue:

a. It claimed that HBOP bought $15,855,343.73 worth of raw materials from Dongfang Trading in fiscal 2007. According to SAIC records, this

---

[3]  One dollar was equivalent to about 6.94 RMB (Renminbi- the Chinese currency) in 2008, 6.83 RMB in 2009 and 6.77 in 2010.

[4]  It is beyond dispute that the Zhenyong Liu that controls Dongfang Trading is the same individual that controls Orient Paper because the personal identity card number for Zhonyong associated with the SAIC filings for Dongfang Trading matches exactly the identity card number associated with HBOP's SAIC filings.

figure is some 30 times Dongfang Trading's reported revenue for that year – demonstrating that revenue was overstated by at least $15.8 million;

      b.   Orient Paper affirmatively misstated revenue in fiscal 2008. Of Orient Paper's top ten customers listed in its 2008 10-K, two did not even exist According to two independent sources (investigation by Plaintiffs' private investigator and credit reports from Qingdao Inter-Credit Services). Specifically, Baoding Huatai Printing Company Limited, accounting for $2.2 million in sales, and Beijing Yuewei Cultural Development Company Limited, accounting for $2.6 million in sales.  Neither of these companies were operating businesses and did not exist according to the credit report.  Their lack of existence was further verified by Plaintiffs' private investigator (see discussion below).

     58.   The 2008 10-K also materially misstated the Company's profits.  The Company's 10-K claims that Dongfang Trading made up 50% of its raw materials purchases and that raw materials account for 70% of cost of sales.  These statements make it impossible for Orient Paper to have earned the revenue it claims to have earned in fiscal 2008. The Company claims it purchased $28.5 million of raw materials from Dongfang Trading in 2008.  Assuming $28.5 million is 50% of all raw materials purchased, the Company spent about $57 million on raw materials alone.  This exceeds the amount the Company allegedly spent on all costs of sale by some $4.7 million.  Thus, even if the Company had no expenses other than purchasing raw materials and SG&A expenses – an admittedly impossible scenario, as the Company's expenses must also include depreciated cost of coal 10% of costs of sale -- it still overstated its profits by some $4.7 million, or about 40% of its total profits.

     59.   The inconsistencies in the Cost of Sales, along with obvious irregularities in selling, general and administrative expenses demonstrate that defendants had been fabricating material aspects of Orient Paper's financial

statements.  For example, Orient Paper claimed to have only $328,825 of selling, general and administrative expense on total sales of $65 million in 2008.

60.     These material inconsistencies discovered by Plaintiffs' forensic accountant and described below demonstrate that defendants did an amateurish job of cooking Orient Paper's books to make the Company appear far larger and more profitable than it was.

61.     The 2008 10-K was false and misleading because Defendants failed to disclose unusual or infrequent events as required by SEC Regulations that reduced the Company's Selling, General, and Administrative Expenses in the 4th Quarter of 2007 and 2008.   In addition, Defendants also failed to describe the reasons for material and unusual discrepancies regarding ONP's disclosures related to the purchase of raw materials which directly impacted the Company's cost of sales ("COS") and related inventory.  Item 7 of SEC Form 10-K and Item 2 of SEC Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), require the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. 229 .303].   In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

62.     The Instructions to Paragraph 303(a) further state:

> Where the consolidated financial statements reveal material changes from year to year in one or more line items, the causes for the changes shall be described to the extent necessary to an understanding of the registrant's businesses as a whole . . . .

Amended Class Action Complaint for Violation of the Federal Securities Laws

63.   In addition, the SEC, in its December 19, 2003 Interpretive Release No. 33-8350, indicated that the MD&A requirements are intended to satisfy, among other things, the principal objective of:

> Provid[ing] information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.

64.   During this Class Period, ONP's net income benefited from unusual transactions or events that materially reduced the Company's SG&A Expenses in the 4th quarters of 2007 and 2008 year ends.   In ONP's 2007 10-K, Defendants disclosed in pertinent part, the following:

> General and administrative expenses were $273,941 during the year ending December 31 2007, a decrease of $18,892 (or approximately 6.45%) from general and administrative expenses of $292,833 for the year ended December 31, 2006.   The decrease in general and administrative expenses was attributable to the reduction in advertisement expenses occasioned by heightened market demand.

65.   Defendants, however, failed to disclose in ONP's 2008 10-K that the Company received a benefit in the 4th Quarter of 2007 reducing ONP's total G&A Expenses by $63,375 for the year ended 2007.   ONP's quarterly expenses for 2007 were as follows:

| | Year ended 2007 | Quarter Ended Mar 30 | Quarter Ended June 30 | Quarter Ended Sept 30 | Quarter Ended Dec 31 |
|---|---|---|---|---|---|
| General and Administrative Expenses | $143,112 | $72,852 | $50,491 | $83,144 | $(63,375) |

66.   In ONP's 2008, 10-K Defendants disclosed in pertinent part, the following:

> Selling, general and administrative expenses were $327,825 for the year ended December 31, 2008, an increase of 129.1% as compared to $143,112 for the same period of 2007. This increase was due

16

primarily to increased business travel and research expenses required to expand our production capacity and market position as well as a general salary increment made to employees, offset by realized foreign currency gains.

67.    Similarly, Defendants failed to disclose in ONP's 2008 10-K that Company received a benefit in the 4th Quarter reducing ONP's total SG&A Expenses by $327,064 for the year ended 2008.  ONP's quarterly expenses for 2008 were as follows:

| | Year ended 2008 | Quarter Ended Mar 30 | Quarter Ended June 30 | Quarter Ended Sept 30 | Quarter Ended Dec 31 |
|---|---|---|---|---|---|
| Selling, General and Administrative Expenses | $327,825 | $220,957 | $202,816 | $231,116 | $(327,064) |

68.    To be sure, ONP's Forms 10-Ks and 10-Qs failed to describe the unusual or infrequent events or transactions that materially and positively impacted the amount of reported income as a result of the reduction in ONP's total SG&A Expenses in the 4th Quarters of 2007 and 2008.  Such disclosure was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision.

**Defendants' Inconsistent Disclosures Related to ONP's Material Suppliers, COS And Inventory**

69.    During this Class Period, Defendants also made inconsistent disclosures related to ONP's material suppliers, COS and inventory.  According to the Company's 2009 10-K, Dongfang Trading Company accounted for 37% and 50% of total purchases for the years ended December 31, 2009 and 2008, respectively.  Additionally, Defendants disclosed that purchases from Dongfang Trading for the years ended December 31, 2009 and 2008 amounted to $30,735,933 and $28,471,056, respectively.  Based on the foregoing information, total raw

Amended Class Action Complaint for Violation of the Federal Securities Laws

material purchases were approximately $83 million ($30,735,933/37%) and $57 million ($28,471,056/50%) for the years ended December 31, 2009 and 2008, respectively.

70.   Alternatively, total raw material purchases can be calculated by adding COS and ending inventory and subtracting beginning inventory.   Based on this calculation raw material purchases were approximately $69,627,941 and $44,753,344 for the years ended December 31, 2009 and 2008, respectively.   The inconsistencies in Defendants' statements resulted in material discrepancies amounting to approximately $13 million and $12 million for the years ended December 31, 2009 and 2008, respectively.   Defendants, however, failed to disclose the reasons for these material discrepancies.   These material discrepancies further cast doubt on the accuracy of Orient Paper's financial statements.

71.   The following table analyzes the Company's raw material purchases and related COS and inventory for the years ended 2008 and 2009:

|  | 2009 | 2008 |
|---|---|---|
| Cost of goods sold (as reflected in the Company's 2009 10-K) | $82,107,531 | $52,643,791 |
| Cost of goods sold – raw materials[5] | 65,686,025 | 42,115,033 |
| Ending inventory – raw materials | 6,320,673 | 2,821,063 |
| Less: beginning inventory | (2,378,757) | (182,752) |
| Total raw material purchases | 69,627,941 | 44,753,344 |
| Raw material purchases from Company's largest supplier (as reflected in the Company's 2009 10-K) | 30,735,933 | 28,471,056 |

---

[5] According to the Company's 2009 10-K, "raw materials account for approximately 70% of our total cost of sales. Electricity and coal account for approximately 10% of total cost of sales, respectively."

| | | |
|---|---|---|
| Biggest supplier percent[6] | 37% | 50% |
| Total estimated purchases of raw materials | 83,070,089 | 56,942,112 |
| GAP between the two methodologies | $ 13,442,148 | $ 12,188,768 |

72.   The discrepancies in the Company's disclosures regarding the purchase of raw materials and its related impact on COS and inventory were material to investors.  Indeed, ONP's COS represents the most material line item on the Company's statement of income.  For example, COS amounted to $82.1 million on sales of $102.1 for the 2009 year end.  Accordingly, Defendants ignored the guidance in Item 303 of Regulation S-K, which requires Companies to describe significant components of expenses, such as COS, in order to understand the Company's results of operations

73.   These discrepancies in Costs of Sales are likely the result of fraud related to the $90 million of undisclosed related party payments to Dongfang Trading.

## Davis' Failures Related to the Company's Lack of Disclosure of Unusual or Significant Transactions

74.   During the course of the audit, Davis knew or recklessly disregarded that significant transactions or events took place outside of the normal course of business for ONP, or that otherwise appeared unusual given Davis' understanding of the Company and its environment.   AU §316.16.   As discussed above, Defendants failed to disclose in ONP's 2008 10-K that the Company's 4th Quarter results received a benefit due to a reduction in ONP's total SG&A Expenses of

---

[6] According to the Company's 2009 10-K, Xushui County Dongfang Trading Company Limited accounted for 37% and 50% of total purchases for the years ended December 31, 2009 and 2008, respectively.

$327,064.  The Chart below reflects ONP's SG&A expenses for each of the four quarters of 2008:



75.     Indeed, Davis failed to consider that significant unusual transactions, especially those close to year-end, can provide opportunities for companies to engage in fraudulent financial reporting.  AU §316.85.  In addition, Davis failed to evaluate whether ONP's financial statements were presented fairly, in all material respects, in conformity with the applicable financial reporting framework, including the consideration of the financial statement presentation and disclosure of the significant unusual transactions or events resulting in a reduction of SG&A expenses of $327,064.  AU § 312.04.

76.     Moreover, Davis failed to gain an understanding of the business rationale for the transactions or events that took place during the 4th Quarter of 2008 and whether that rationale suggested that the transactions may have been entered into to engage in fraudulent financial reporting.  AU § 316.66.

77.     Davis was also required to read the other information accompanying the annual financial statements contained in the 2008 10-K filed with the SEC.  AU § 550.04.  The MD&A in ONP's 2008 10-K failed to disclose the significant unusual events or transactions that materially and positively impacted the

Company's SG&A expenses and net income during the 4th Quarter and year ended 2008. Davis, however, failed to consider whether that information contained in the MD&A was materially inconsistent with the financial statements. Moreover, Davis failed to compare Defendants' inconsistent disclosures related to ONP's material suppliers with the Company's representations related to COS and inventory. The inconsistency in Defendants' statements resulted in material discrepancies amounting to approximately $12 million for the year ended December 31, 2008. Accordingly, because there was a material inconsistency, Davis should have determined whether the financial statements, the audit report, or both required revision. AU §§ 550.04-05.

78.    ONP's Forms 10-Ks and 10-Qs failed to describe the unusual or infrequent events or transactions that materially and positively impacted the amount of reported income as a result of the reduction in ONP's total SG&A Expenses in the 4th Quarters of 2007 and 2008. Such disclosure was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision.

79.    The combined effect of misstating expenditures and revenue had the predictable and intended effect of making the Company seem very much larger than it actually was. Hiring an auditor based out of Cedar Rapids, Utah, three flights from China, that had been disbarred for (among other things) not being independent of its clients, had the predictable and intended effect of concealing the deception.

**Defendants Signed the False and Misleading 2008 10-K**

80.    The 2008 10K was signed by defendants Zhenyong, Hao, Dahong Zhou, - as well as non-defendant Chen Li – former legal representative and shareholder of Dongfang Trading. Defendants Hao and Zhenyong signed the accompanying Sarbanes-Oxley ("SOX") certifications, which was also false and misleading.

Amended Class Action Complaint for Violation of the Federal Securities Laws

81.     On May 1, 2009, the Company installed Defendant Winston Christopher Yen as Chief Financial Officer ("CFO") as part of a loan-out agreement.  Defendant Yen was employed as part-time CFO for the company, for up to eighty hours a month.  He later assumed this position full-time.

82.     On September 10, 2009, the Company made a powerpoint presentation to institutional investors.  As the presentation included financial numbers drawn from the 2008 10-K, it contained false and misleading statements.  The Company indicated that investors should address further questions to Defendant Yen.  The Company listed Defendant Davis Accounting Group as its registered independent accountant, almost a year after its license had been revoked.

83.     On October 29, 2009, the Company announced the appointment of Defendant Drew Bernstein, along with non-defendant Wenbing Christopher Wang, and Zhaofang Wang to its Board of Directors as independent directors effective October 28, 2009.  The Company touted Defendant Bernstein's credentials as a certified public accountant in particular – he was made Chairman of the Audit Committee.

84.     To the announcement of this news, the Company appended its Code of Ethics.  The Code of Ethics provides, in relevant part:

> AVOID CONFLICTS OF INTEREST
> Our officers, directors and employees have an obligation to give their complete loyalty to the best interests of the Company. They should avoid any action that may involve, or may appear to involve, a conflict of interest with the company. **Officers, directors and employees should not have any financial or other business relationships with suppliers, customers or competitors that might impair, or even appear to impair, the independence of any judgment they may need to make on behalf of the Company.** [Line break] HERE ARE SOME WAYS CONFLICTS OF INTEREST COULD ARISE: [...]  Ownership of, or substantial interest in, a company that is a competitor, client or supplier. [emphasis added]

85.     The Company did not disclose that its CEO owned a 70% stake in its main supplier, and therefore arguably fell under the prohibition on "ownership of,

or substantial interest in, a company that is a [...] supplier." The Code of Ethics was therefore false and misleading in that it claimed that the Company's officers actually would abide by its terms: "This code provides ethical standards to which all of our executive officers, including our principal executive, financial and accounting officers, our directors, our financial managers and all employees are expected to adhere".

86.    On November 25, 2009, issued a prospectus to sell shares in the Company. The November 25 Prospectus incorporated by reference the fraudulent 2008 10-K. It thus contained the same false and misleading statements concerning the fiscal 2007 and 2008 financial statements as described above. The November 25 Prospectus was signed by all defendants, including Defendant Bernstein.

87.    On December 1, 2009, the Company announced that it had selected not to retain the Davis Accounting Group for its successive audits. The announcement misleadingly omitted mention that the Davis Accounting Group was not licensed to audit public companies, and had not been licensed when it conducted the Company's 2008 audit. The Announcement was signed by Defendant Liu.

88.    On February 1, 2010, the Company issued an amended 10K for the fiscal year ending December 31, 2008. The amended 10-K reiterated all of the same false and misleading financial statements set forth in Orient Paper's original fiscal 2008 10-k filed on March 27, 2009 regarding the Company's financial statements, and ownership of HBOP. It again failed to disclose material facts, such as that its CEO and Chairman's 70% interest in its main supplier. This amended 10-K was signed by Defendant Bernstein, along with all other defendants. The Sarbanes-Oxley certifications were signed by Defendants Yen and Zhenyong.

89.    On March 29, 2010, the Company filed its 10K for the year ending December 31, 2009. The 2009 10-K reissued the March 19, 2009 opinion letter from the Davis Accounting Group fraudulently certifying the Company's fiscal 2008 financial statements. The Davis Accounting Group was not licensed to certify

Amended Class Action Complaint for Violation of the Federal Securities Laws

the Company's 2008 financial statements.   Their license had been revoked for (amongst other things), not being independent enough of their clients.

90.   The 10K also falsely claimed that HBOP earned $102,142,828 in revenue.   The revenue figure false because analyses of HBOP's ten largest customers listed in the 10-K show that most of them could not possibly have purchased the amounts defendants claim they did.

91.   The amounts listed for sales to the top ten customers in 2009 are false for the following reasons:

a.   The Company listed Hebei Tianpurun ("Hebei Tianpurun") Printing Company Limited as HBOP's largest customer, with sales of $5,333,532.   Orient Paper could not possibly have sold $5.3 million of goods because Hebei Tianpurun's total revenue was only $5.9 million in 2009 according to a conversation with management as reported by Muddy Waters. According to Qingdao Inter-Credit Services Pte Co., Ltd , Hebei Tianpurun, cost of goods sold as a percentage of total sales was 82%i in 2007 and 81% in 2008.[7]  Assuming a similar percentage in 2009 would imply that total costs of goods sold for 2009 would be $4.7 million. Thus, HBOP's sales figure is not plausible even if Hebei Tianpurun incurred nearly all of its expenses on HBOP's products.  This is impossible because necessarily Hebei Tianpurun spent money on energy for manufacturing, machinery, staff (it had 200 employees), and other supplies (for instance, ink).

b.   The Company stated that HBOP sold $2,101,852 of goods to Hebei Marching Paper Products & Packaging Company Limited.  According to Qingdao Inter-Credit Services Pte Co., Ltd., Hebei Marching has total costs of goods sold for 2009 of $1.9 million.  The claimed $2.1 mm sales figure is greater than Hebei Marching Paper Products total cost of goods sold for the year 2009, and Hebei

---

[7]  Muddy Waters' sales figure of $5.9 million for Hebei Tianpurun for 2009 is reasonable as the credit report shows 2007 revenue as $3.6 million and 2008 revenue as $4.4 million.

Marching Paper did not accumulate large inventories because their inventory turned over every 27 days according to the credit report. Moreover, its impossible that Hebei Marching did not incur other costs of goods sold such as energy, other raw materials or depreciation. Therefore, the Company's figures for sales to Hebei Marching Paper are false and misleading.

      c.     The Company claims that HBOP sold $3.4 million of supplies to Mancheng Wenzhai Printing Company Limited.  But according to a report by Qingdao Inter-Credit Services Pte Co., Ltd., Mancheng Wenzhai had total revenues of only $158,000 in 2008; it had cost of goods sold of only $132,000; its cost of goods sold as a percentage of sales was 85% and its inventory turned over every 182 days.  Thus it is inconceivable that in 2009 its revenue increased from $158,000 to close to $4.0 million and impossible that its costs of goods sold similarly increased 2,530% in a year.  Therefore, the Company's report on sales to Mancheng Wenzhai, if there are even any sales, are falsified by an order of magnitude. A representative of Mancheng Wenzhai told Plaintiffs' investigator that Mancheng Wenzhai no longer did business with the Company.  Muddy Waters' report stated that Mancheng Wenzhai did not have "ordinary taxpayer status" which based on local tax regulations means that its revenue is less than $700,000 annually.

      d.     The Company stated that HBOP sold $4.9 million of goods to Baoding Huatai Printing Co., Ltd. ("Baoding Huatai").  According to Qingdao Inter-Credit Services Pte Co., Ltd. in a report dated September 1, 2010, Baoding Huatai had total annual sales of $644,000 in 2007 and $950,000 in 2008.  Even if HBOP was Baoding Huatai's only supplier for 2009 (which is implausible), if one assumes similar gross profit margins for Baoding Huatai in 2009, after it purchased $4.9 million of supplies from HBOP, its sales would have grown to about $6.1 million. It is highly unlikely that Baoding Huatai increased its sales by 600% from 2008 to 2009 given that its sales increase from 2007 to 2008 was less than 50%.

e.     HBOP claims to have sold $4.3 million of goods to Baoding Hengyi
Printing Company Limited in 2009.  Plaintiffs' private investigator determined that
Baoding Hengyi had no working phone number, no website, and no publicly
available information.  The report issued by Muddy Waters made the same findings
and confirmed that  Baoding Hengyi likely does not exist as an operating business,
and therefore could not have purchased $4.3 million of goods from HBOP.

f.     HBOP claims to have sold $3.1 million of goods to Baoding Times
Printing Company Limited in 2009.  Plaintiffs' private investigator determined that
Baoding Hengyi had no working phone number, no website, was not registered to
do business or have other necessary business licenses and there was no publicly
available information for it.  The report issued by Muddy Waters made the same
findings and confirmed that  Baoding Times likely does not exist as an operating
business, and therefore could not have purchased $3.1 million of goods from
HBOP.

g.     HBOP claims to have sold $2.9 million of goods to Baoding Morning
Light Printing Company Limited in 2009.  Plaintiffs' private investigator
determined that Baoding Morning Light had no working phone number, no website,
was not registered to do business or have other necessary business licenses and
there was no publicly available information for it.  The report issued by Muddy
Waters made the same findings and confirmed that  Baoding Times likely does not
exist as an operating business, and therefore could not have purchased $2.9 million
of goods from HBOP.

92.    The 2009 10-k and financial statements contained therein are also false
and misleading because defendants failed to disclose over $90 million in related
party transactions with Dongfang Trading.   The Company did not disclose that its
CEO Liu held a 70%  interest in Dongfang Trading its main supplier, as described
in above.

Amended Class Action Complaint for Violation of the Federal Securities Laws

93.     The fiscal 2008 financial statements contained in the 2009 10-K were also false and misleading for the same reasons as set forth in  above.

94.     The 2009 10-K was signed by defendants Liu, Yen, and Bernstein. Because he chaired the Audit Committee and is a licensed CPA, Defendant Bernstein was particularly culpable for the fraudulent statements in the 2009 10-K. The Sarbanes-Oxley Certifications were signed by Defendants Liu and Yen.

95.     On March 31, 2010, the Company entered into an underwriting agreement to sell 3,000,000 shares of its stock.  The Prospectus for the stock sale was based on the fraudulent 2009 10K, and incorporated these filings by reference. The Prospectus included financial data from the year ending in 2008 drawn from the firm's fraudulent fiscal 2008 financial statements.  These data had never been audited by a qualified auditor, yet the Company claimed that it derived its data (including the 2008 data) from "audited financial statements".  The Prospectus also incorporated by reference the 2008 10-K, including the fraudulent opinion letter from the Davis Accounting Group.  Therefore, every false and misleading statement described in the 10Ks was also present in this stock sale.   Orient Paper received almost $30.0 million from the sales of its stock.

## IV.     ORIENT PAPER'S STOCK PRICE DROPPED AS THE FRAUD WAS DISCLOSED OVER TIME
### The Muddy Waters Report And Its Aftermath

96.     After close of trading on June 28, 2010, a research company called Muddy Waters LLC ("Muddy Waters") issued a scathing report on the Company (the "Muddy Waters Report").

97.     The thirty-page Report rated the Company's stock as a "strong sell" and set forth a host of detailed criticisms that questioned the veracity of the information contained in the Company's financial statements and press releases. The Report shocked the market and caused the Company's stock to decline from its

Amended Class Action Complaint for Violation of the Federal Securities Laws

closing price of $8.33 on June 28 to a closing price of $7.23 on June 29, 2010—a decline of roughly 13%. As the market continued to digest the content of the Report, the Company's stock fell further and would eventually reach a low of $4.11 per share on July 1, 2010.

98.    The fraud caused investors shares to lose 40% of their value $3.24/share.

99.    The Muddy Waters Report contended that Orient Paper had overstated revenue because many of its top 10 customers did not exist or could not have possibly purchased the volumes of goods Orient Paper had claimed.

100.   The Company attempted to refute the allegations in the Muddy Waters Report during the next week. The defendants' denials of the fraud had the effect of temporarily increasing or stabilizing the price of Orient Paper stock.

101.   Muddy Waters issued another scathing report on Orient Paper on July 1, 2010 responding to Orient Papers' denials which further describing the fraud at Orient Paper.

102.   The Company did not issue its riposte to the Muddy Waters July 1 Response until July 6.  In a press release issued that day (The "ONP July 6 Press Release"), ONP disputed many of the Report's arguments, mainly with conclusory denials, vague assertions of propriety, and implications that the motives of the Report's authors were impure.

103.   The Company did not issue its riposte to the Muddy Waters July 1 Response until July 6.  In a press release issued that day (The "ONP July 6 Press Release"), ONP disputed many of the Report's arguments, mainly with conclusory denials, vague assertions of propriety, and implications that the motives of the Report's authors were impure. The market, however, was not convinced: ONP's share price dropped after the publication of the Company's unconvincing 4,500-word public denial, from an open of $7.39 per share to a close of $6.77 per share.

104.   Additional adverse disclosures came to light on July 15, 2010. That day, an article published on Seekingalpha.com set forth the case of fraud against ONP. The article noted that from 2008 to 2009, the Company's claimed employee count, according to its SEC filings, remained static at 600 even while ONP claimed to have grown its revenues by 57%. No less implausible was the Company's claim that it had tripled its sales within three years but spent only $655 on advertising and promotion during 2008 and 2009 combined. In response, the Company's share price dropped from an open of $7.01 to $6.31 at closing.

105.   The following day, on July 16, 2010, the Company shocked the market by announcing that it would retain law firm Loeb & Loeb LLP and an unnamed a consulting firm to conduct an independent investigation into the issues raised by Muddy Waters. In response, the Company's share price declined from an open of $6.15 per share to a close of $5.89 per share.

106.   The fraud caused ONP stock to fall further on July 22, 2010, when Muddy Waters posted on its website an English-language translation of an article published by the 21st Century Business Herald, which Muddy Waters described as "one of China's most respected business publications." The article revealed, among other things, that the entity analyzed in the Report was, in fact, ONP's actual operating subsidiary. The article also explained that Xushui County Dongfang Trading Co. Ltd. ("Dongfang Trading"), which is ONP's single largest raw materials supplier, is actually a shell company with little to no revenue. Moreover, the article revealed that the first shareholder of Dongfang Trading was Zhenyong Liu, the CEO of ONP. Dongfang Trading's second shareholder was Li Chen, a former director of ONP. And most damning was that Dongfang Trading's address is identical to the address of HBOP, ONP's operating subsidiary. The Company's apparent failure to disclose the related-party transaction described in the article shocked the market, causing the Company's share price to decline from an open of $5.00 to a low of just $4.13 and a close of $4.46.

107.  On August 9, 2010, another deprecatory article was published on Seeking Alpha.  The Article reiterated the claim that Dongfang Trading was a shell company and added the additional adverse news that Orient Paper's CEO had a 70% interest in Dongfang Trading.  This disclosure caused Orient Paper's stock price to drop another 7%.

108.  On August 12, 2010, Chimin Sang posted a report on Seeking Alpha detailing the inconsistencies in Orient Paper's Costs of Sales and Selling, General Administrative Expenses detailed above and showed how this evidenced fraud.  As a result of this disclosure, the share price of Orient Paper dropped another 8%.

109.  The Company's stock opened on August 9, 2010 at $5.55.  The adverse disclosures on August 9 and 12 caused the Company's stock to drop every day through close of trading on August 12, 2010, when it reached $4.27.

110.  Faced with these daunting allegations, the Company hired counsel to assist its Audit Committee with an internal investigation.  The law Loeb was hired as legal counsel to assist the Committee, and the consulting firm affiliated with Deloitte & Touche LLP ("Deloitte") to assist Loeb.  Beyond these statements, the Company did not disclose in what capacity it employed Loeb & Loeb and Deloitte.  It did not advise the public of what documents it provided to them or allowed them to access, what degree of independence they were to exercise, and what authority they had to question the Company's decision.  At the close of the investigation, neither Loeb & Loeb nor Deloitte issued any signed statement attesting to the tasks they had performed in assisting the Audit Committee with its investigation.

111.  Not surprisingly, the Audit Committee – every member of which is alleged to have conspired in the fraud – pronounced itself satisfied and whitewashed the whole affair.  Yet despite defendants' feeble attempt to exculpate themselves, the audit made several troubling findings.  Thus, although the Company was apparently satisfied that its CEO "produced evidence" (they do not specify what evidence, nor did the Company disclose it) that he disposed of his

interest in the Company's main supplier Dongfang Trading in 2004, the Company admitted that SAIC records showed he did not dispose of it until August 2010. Liu's purported "sale" of his interest in Dongfang Trading in 2004 is clearly a lie because SAIC records for Dongfang Trading show Liu actually increased his investment in Dongfang Trading from RMB 0.35 million to RMB 3.5 million on June 12, 2006.

## VII. ADDITIONAL MISLEADING STATEMENTS

112.   On May 15, 2009, the Company filed a Quarterly report for the first Quarter of 2009.  For all the reasons discussed above, it was false and misleading. This Quarterly report was signed by defendants Liu and Yen.

113.   On August 14, 2009, the Company filed a Quarterly report for the second Quarter of 2009.  For all the reasons discussed above, it contained false and misleading statements.   This Quarterly report was signed by defendants Liu and Yen.

114.   The Press Release issued the same day and filed with the SEC on August 17, 2009 announcing the results of the 10-Q, is false for precisely the same reasons.   Finally, the Press Release quotes Defendant Zhenyong Liu as making these false and misleading statements.    The Sarbanes-Oxley Certifications were signed by Defendants Liu and Yen.

115.   On November 13, 2009, the Company filed a Quarterly report for the third Quarter of 2009.  For all the reasons discussed above, and as it contained financial numbers from the 2008 10-K, it was false and misleading.  This Quarterly report was signed by defendants Liu and Yen.

116.   The Press Release issued November 16, 2009 and filed with the SEC November 19, announcing the results of the 10-Q, is false for precisely the same reasons.  Finally, the Press Release quotes defendant Liu as making these false and

misleading statements.   The Sarbanes-Oxley Certifications were signed by Defendants Liu and Yen.

117.   On February 1, 2010, the Company issued an amended 10Q for the third Quarter of 2009.   For all the reasons discussed above, it was false and misleading.  This 10-Q was signed by Defendant Bernstein.   The Sarbanes-Oxley Certifications were signed by Defendants Liu and Yen.

118.   On February 5, 2010, the Company announced preliminary unaudited results for Fiscal Year 2009.  For reasons discussed above, these statements were false and misleading.  Defendant Liu was quoted as making false statements about the Company's financial statements.  Defendant Yen was listed as contact person for further questions.

119.   The Press Release issued the same day and filed with the SEC on February 8, 2010 announcing the results of the Q1 2009 10-Q, is false for precisely the same reasons.   The Sarbanes-Oxley Certifications were signed by Defendants Liu and Yen.

120.   On May 13, 2010, the Company issued a Quarterly report for the first Quarter of 2010.  For all the reasons discussed above, this report contained false and misleading statements.

121.   The Press Release issued the same day, announcing the results of the 10-Q, is false for precisely the same reasons.   In addition, the Press Release misleadingly states revenues by implying that the Company earned the listed revenues it listed.

## VIII. ADDITIONAL FACTS SUGGESTIVE OF SCIENTER

### A.   The Company's Corporate Structure

122.     The 2008 10-K also materially misled investors to believe that Orient Paper has a 100% equity ownership interest of HBOP, its main operating business, when in fact HBOP was owned 100% by defendant Liu and other insiders

Amended Class Action Complaint for Violation of the Federal Securities Laws

and Orient Paper merely has the contractual right to 80% of HBOP's profits. While Orient Paper subsequently disclosed the true facts of its rights to HBOP's profits, it buried this disclosure in the bowels of its 10-K, while continuing to display front and center in many of its press releases and SEC filings that Orient Paper had a 100% equity interest in HBOP. For example, the 2008 10K stated that Defendant Zhenyong Liu is the Chairman of HBOP, "the Chinese operating subsidiary of Dongfang Zhiye Holding Limited, *which entity was acquired by our Company*"; Orient Paper is "the holding company" for HBOP. The 2008 10K includes a chart which visually and falsely describes the relationship between HBOP and the Company:[8]

| **Orient Paper, Inc.** (Nevada company) |
| --- |

100%

ownership

| **Dongfang Zhiye Holding Limited** (BVI company) |
| --- |

100%

ownership

---

[8]  The Company made this same misrepresentation in its 2007 10-K issued on March 31, 2008.

.

33

| Hebei Baoding Orient Paper Milling Company Limited
(PRC company) |

123.   Orient Paper further misstates the relationship between it and Dongfang Holding in outlining risk factors:

> We, through our subsidiaries Dongfang Holding or HBOP, may review acquisition and strategic investment prospects that we believe would complement the current product offerings of HBOP, augment its market coverage or enhance its technical capabilities, or otherwise offer growth opportunities. From time to time we review investments in new businesses and we, through our subsidiary, Dongfang Holding or HBOP, expect to make investments in, and to acquire, businesses, products, or technologies in the future.

124.   While these statements are all materially false, they do not serve as the predicate false statements for the securities claims alleged in this Complaint. Rather these false statements show a pattern and practice by defendants of issuing false and misleading statements to investors during the Class Period.

125.   Orient Paper did not own HBOP; a few of its directors owned it in whole. Orient Paper's control over its sole productive asset was only ever as secure as its control over its directors and associated contractual obligations. Thus, Orient Paper materially overstated the degree of control it held over HBOP. Orient Paper and its officers or directors can scarce claim that they were unaware of their own corporate structure. Therefore, every signatory of the 2008 10-K (every director) was aware of this misrepresentation. This, in turn, suggests that the signatories had scienter with respect to other materially false statements.

126.   On June 25, 2009, Orient Paper entered into a material agreement with Barron Partners, LP, Fernando Liu, Golden1177 LP, (the "Other Parties") and Dongfang Trading (the "June Transaction").   In this transaction, the Company first revealed that it, and therefore its shareholders, did not hold an ownership interest in HBOP – the Company's then sole productive asset. Rather, HBOP's shares were held by directors of the Company (all defendants in this fraud action).   With amazing nonchalance, the Company acknowledged – in passing -- that it had never owned controlling stock in HBOP, but had operated and controlled it through a nonpublic trust agreement with its own directors.  The Company also revealed *in an attachment* that it was only entitled to 80% of HBOP's revenues.  Nevertheless, the Company continued to represent to the public that HBOP's revenues were its own. Thus, the Company's Press Releases consistently tout "Our, "the Company's" (a defined term meaning Orient Paper), or even "Orient Paper's" revenue, or profits, or success, when it really set out figures for HBOP.   Only by closely reading the accompanying document would the reader realize that Orient Paper was only entitled to 80% of the listed revenues and profits.

127.   Even though Orient Paper disclosed in this and every subsequent 10-K and 10-Q that it was only entitled to 80% of HBOP's profits, every single press release accompanying these 10-Ks and 10-Qs misleadingly listed HBOP's revenue, rather than Orient Paper's.  Thus, although technically disclosing the inconvenient fact that it was only entitled to 80% of HBOP's profits, took literally every single opportunity to imply that it was entitled to all of them.

128.   On May 28, 2008, the Company issued a press release announcing its plans to build a paper milling line whose capacity would be 1.2 *million* tons of paper.  The Press Release stated that the Company expected the line to deliver annually between $800M and $1.3B in revenue and $160M to $230M in net income. The Press Release stated that the Company would "build the [line] in the second half of 2008".   The Company never issued an 8-K for this plan that would

35

allegedly increase its income by a factor of 10 at least, never followed-through, and never explained what had happened.

129.  On June 4, 2008, the Company issued a press release announcing that it, to quote from the Press Release's Headline, "Expects to Produce $40M in Revenues from Conversion to Anti-Counterfeit Paper Production Line."  The Company elected not to file an 8K with the SEC.  The new line would have increased revenues by approximately 50%, and so must qualify as material.  Oddly, not only did the revenues never materialize, but the Company never discussed this plan, or why it was abandoned, in any further 10Q or 10K.

130.  These incidents are probative of scienter.  They show a pattern of making materially false statements.

131.  On June 25, 2009, Orient Paper entered into a material agreement with Barron Partners, LP, Fernando Liu, Golden1177 LP, (the "Other Parties") and Dongfang Trading (the "June Transaction").  Under the terms of the agreement, Dongfang Trading agreed to sell to the other parties to the transaction an aggregate of 2,000,000 shares of the Company's common stock at $0.375 per share, for an aggregate purchase price of $750,000.  Allegedly to induce Dongfang Trading to make this sale, Orient Paper paid Dongfang Trading, a company 70% owned by Orient Paper's CEO, $500,000.  Orient Paper misleadingly did not disclose that this was a related party transaction.  In short, defendant Liu sold $750,000 worth of stock and may have received another $500,000 from Orient Paper as consideration.

132.  Some additional terms of the June Transaction are suspicious.  Andrew Barron Worden, the CEO of one of the Purchaser who purchased the majority of the stock, had previously pled guilty and served a year in prison for wire fraud in connection with illegal securities transactions.  Also, the Company had not previously revealed that Dongfang Trading held a large proportion (about 4.4%) of the Company's stock. The Company's SEC filings do not disclose how the

Amended Class Action Complaint for Violation of the Federal Securities Laws

Company's largest supplier, 70% owned by its Chairman, came to hold 4.4% of its stock.

133.   On October 7, 2009, the Company entered into a Private Placement Agreement ("PPA").   In return for 8,333,332 shares, the Company received $5.0 million for the sale of stock.   The Company also granted 1,500,000 options to its employees, at an exercise price of $0.60.

134.   As part of the agreement, the Company placed a further 3,000,000 shares in escrow for the benefit of the buyers (the "Escrow Shares").   The Escrow Shares would be released to the Company provided the Company met performance targets for the year ending December 31, 2010.   This provides the company with a motive to continue to hide misbehavior.

135.   On October 7, 2009, Chairman and CEO Zhenyong Liu entered into a lock-up agreement.   The lock-up agreement placed four million of Defendant Zhenyong Liu's shares into escrow, preventing him from selling or otherwise disposing of them, until December 31, 2010.   This gave Defendant Zhenyong Liu a motive to continue to conceal Orient Paper's financial misbehavior until a point in time when he would be permitted to sell his stock.

136.   Defendant Bernstein filed a contested Chapter 13 bankruptcy petition in December, 2002.   Notably, the Company did never disclosed Defendant Bernstein's Chapter 13 petition.

137.   On July 21, 2008, the SEC filed a letter it had sent to the Company. The filed letter required the Company to properly document its internal controls on accounting.

138.   On October 1, 2008, the Company responded to the SEC:

> Based upon the Company's assessment of its internal controls over financial reporting as of December 31, 2007, management concluded that **such controls were not effective** as they were not designed to facilitate the external financial reporting required of a publicly held company under the Sarbanes-Oxley Act of 2002.

37

Moreover, because Hebei Paper's accounting records were historically maintained using accounting principles generally accepted in the People's Republic of China, its personnel may not be fully familiar with accounting principles generally accepted in the United States of America.

139.    Thus, defendants were aware that Orient Paper's internal controls were defective and that there was a high risk of inaccurate and misleading financial statements being issued by the Company.   Instead of fixing the defective internal controls, defendants concealed and perpetuated the lax internal controls so as to continue their fraud.

140.    On January 26, 2010, the Company publicly and to the SEC made the following statement:

The Company maintains a set of disclosure controls and procedures designed to ensure that information required to be disclosed by the Company in the reports filed under the Securities Exchange Act, is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms. Disclosure controls are also designed with the objective of ensuring that this information is accumulated and communicated to the Company's management, including the Company's chief executive officer and chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.

Based upon their evaluation as of the end of the period covered by this report, the Company's chief executive officer and chief financial officer concluded that, the Company's disclosure controls and procedures are effective to ensure that information required to be included in the Company's periodic SEC filings is recorded, processed, summarized, and reported within the time periods specified in the SEC rules and forms. Our chief executive officer and chief financial officer also concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed in the reports required to be filed or submitted under the Exchange Act is accumulated and communicated to the our management, including our chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

[…]

Amended Class Action Complaint for Violation of the Federal Securities Laws

For the fiscal year ended December 31, 2008, we carried out an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures pursuant to Exchange Act Rule 13a-15(b). In making this assessment, we used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control – Integrated Framework. This evaluation was conducted by Zhenyong Liu, our chief executive officer, and Jing Hao, our chief financial officer. Based upon this evaluation, the chief executive officer and the chief financial officer concluded that our internal control over financial reporting is effective based on those criteria. (Emphasis in original).

141.  Here, Defendants Zhenyong Liu, Hao, and Yen affirmatively take responsibility for management's control over internal disclosures and falsely claim to have corrected Orient Paper's defective internal controls over financial reporting.

142.  On February 1, 2010, the Company issued an amended 10-K for fiscal year 2008.  In particular, it reproduced the chart claiming it had (as of December 31, 2008) an 100% ownership in HBOP.

## VIII.  PLAINTIFFS' CLASS ACTION ALLEGATIONS

143.  Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of Orient Paper during the Class Period and who were damaged thereby.  Excluded from the Class are Defendants, the present and former officers and directors of Orient Paper and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

144.  The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Orient Paper's stock was actively traded on either the OTC market or the NYSE AMEX.

145.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs

Amended Class Action Complaint for Violation of the Federal Securities Laws

believe that there are at least hundreds, if not thousands, of members in the proposed Class.  Members of the Class may be identified from records maintained by Orient Paper or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

146.  Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

147.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

148.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Orient Paper; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

149.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.    RELIANCE PRESUMPTION

150. At all relevant times, the market for Orient Paper common stock was an efficient market for the following reasons, among others:

a. Orient Paper stock met the requirements for listing, and was listed and actively traded on the OTCBB market until December 17, 2009 when it was listed for trading on the NYSE AMEX, both highly efficient and automated markets;

b. As of March 26, 2010, there were 14,883,691 shares of our common stock issued and outstanding. The public float (shares not held by insiders/defendants) was about 9.8 million shares.

c. During the class period, on average, 907,000 shares of Orient Paper common stock were traded on a weekly basis. Approximately 9.3% of the public float, and 6.1% of all outstanding shares, were bought and sold on a weekly basis, demonstrating a very strong presumption of an efficient market;

d. As a regulated issuer Orient Paper filed with the SEC periodic public reports and was eligible (and did file) S-3 registration statements with the SEC during Class Period;

e. Orient Paper regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

f. Orient Paper was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period;

g. At least 75 NASD member firms were active market-makers in Orient Paper stock at all times during the Class Period; and

h. Unexpected material news about Orient Paper was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

## X.   FIRST CAUSE OF ACTION

## Violation of Section 10(b) of

## The Exchange Act Against and Rule 10b-5

### Promulgated Thereunder Against All Defendants

151.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

152.   This cause of action is asserted against all Defendants.

153.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell Orient Paper's securities at artificially inflated and distorted prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, individually and as a group, took the actions set forth herein.

154.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Orient Paper as specified herein.

155.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Orient Paper's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Orient Paper and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions,

practices and a course of business that operated as a fraud and deceit upon the purchasers Orient Paper securities during the Class Period.

156. Each of the defendants' primary liability, and controlling person liability, arises from the following: (a) defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their responsibilities and activities as senior officers and/or directors of the Company, were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (c) defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and (d) defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

157. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Orient Paper's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' false and misleading statements during the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

158. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Orient Paper's securities was artificially inflated during the Class Period.

Amended Class Action Complaint for Violation of the Federal Securities Laws

In ignorance of the fact that market prices of Orient Paper's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired Orient Paper's securities during the Class Period at artificially high prices and were damaged thereby.

159.  At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Orient Paper's financial results and condition, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired Orient Paper securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

160.  By virtue of the foregoing, the defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

161.  As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

162.  This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## XI.    SECOND CAUSE OF ACTION
### Violation of Section 20(a) of The Exchange Act
### <u>Against the Individual Defendants</u>

Amended Class Action Complaint for Violation of the Federal Securities Laws

163.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

164.  This Second Claim is asserted against each of the Individual Defendants.

165.  The Individual Defendants, except Edwin Davis, acted as controlling persons of Orient Paper within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

166.  In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

167.  As set forth above, Orient Paper and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

168.  Edwin Davis was a controlling person of the Davis Accounting Group. He was the main principal of Davis Accounting Group and signed the opinion letters fraudulently certifying Orient Papers' financial statements.  Edwin Davis is

Amended Class Action Complaint for Violation of the Federal Securities Laws

therefore liable as a control person for the Davis Accounting Group's primary violations under §10(b) set forth above.

169. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

170. This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## XII  JURY TRIAL DEMANDED

171. Plaintiffs hereby demand a trial by jury.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

b. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

Amended Class Action Complaint for Violation of the Federal Securities Laws

1    Dated:  January 28, 2011          Respectfully submitted,

2                                      **THE ROSEN LAW FIRM, P.A.**

3

4

5                                      _____

                                       Laurence M. Rosen, Esq. (SBN 219683)
6                                      THE ROSEN LAW FIRM, P.A.

7                                      333 South Grand Avenue, 25th Floor
                                       Los Angeles, CA 90071
8                                      Telephone: (213) 785-2610
                                       Facsimile: (213) 226-4684
9                                      Email: lrosen@rosenlegal.com

10                                     Lead Counsel for Plaintiffs and Class

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Amended Class Action Complaint for Violation of the Federal Securities Laws

**CERTIFICATE OF SERVICE**

I, Ilya Glinchenko, pursuant to 28 U.S.C. §1746, hereby declare under penalty of perjury as follows:

I am an employee of the Rosen Law Firm, P.A.   I am over the age of eighteen.

On January 28, 2011, I served filed the following **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** by U.S. mail to counsel of record for all defendants at the addresses listed below:

> Robert D. Weber
> DLA Piper US LLP
> 1999 Avenue of the Stars, Fourth Floor
> Los Angeles, California  90067

> Attorney for Defendants

On the same date I also caused the document to be submitted to the Stanford Law School Class Action Clearinghouse via email to scac@law.stanford.edu.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 28, 2011, in New York, New York.

Ilya Glinchenko